THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| FOX RUN I, LLC, a Utah Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SPRINGVILLE, a Utah municipality,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [94] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00223-DBB-DBP<br><br>District Judge David Barlow |

Before the court is Defendant City of Springville's ("Springville") Motion for Summary Judgment, which seeks to dispose of Plaintiff Fox Run I, LLC's ("Fox Run") federal constitutional claims.[1] For the following reasons, the court GRANTS Springville's motion.

## BACKGROUND

This case arises from the denial of a building permit for a senior living facility in Springville, Utah. In 2014, Springville adopted a definition of "Senior Independent Living Facility" that did not include an age restriction,[2] and beginning in 2016, Fox Run sought to apply for a building permit for a Senior Independent Living Facility utilizing the definition that did not include an age restriction (the "Project").[3] In 2017, Springville adopted a new definition for "Senior Independent Living Facility" that restricted use to individuals aged 55 and older.[4] The

---

[1] Springville's Mot. for Summ. J. ("Def.'s Mot."), ECF No. 94.
[2] *Id.* at 11; Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") 3, ECF No. 103.
[3] Def.'s Mot. 11; Pl.'s Opp'n 3.
[4] Def.'s Mot. 11; Pl.'s Opp'n 3.

parties dispute whether Fox Run had applied for final approval for the Project prior to the definitional change.[5] Nevertheless, in 2017, the parties entered into a Settlement Agreement in an attempt to resolve their dispute.[6]

Under the Settlement Agreement, the parties agreed that no age restriction would apply to the Project and that Fox Run would have a vested property interest to construct the Project as shown in the development plans attached as Exhibit B to the Settlement Agreement.[7] In addition, the parties agreed that "no building permit application has been submitted" for the Project and that "each building permit application shall go through [the] City's building permit process."[8] Next, the parties agreed that Fox Run would resolve Springville's redlines on its development plans before it applied for a building permit.[9] And Fox Run agreed "that the building exterior elevations and interior plans shown on [Exhibit B] will be the building elevations and interior plans for the buildings constructed within the Project[.]"[10] Fox Run agreed to follow a particular timeline for its application for a building permit:

> e.      Section 11-7-409 of the Springville City Code requires that a building permit for an approved site plan must be applied for within six months and allows for one six month extension. The parties agree that Fox Run's Site Plan validity of approval timeframe to apply for a building permit for Phase 1 of the Project . . . shall commence as of the date when resolution of all contingencies or redline comments for all phases of the Development Plans are completed, as determined by City[.] City shall notify Fox Run of the Commencement Date by sending a written notice to Fox Run[.]

---

[5] *See* Def.'s Mot. 11; Pl.'s Opp'n 3.
[6] *See* Am. Compl. ¶ 14, ECF No. 61; Settlement Agreement and General Release of All Claims ("Settlement Agreement"), ECF No. 81-1.
[7] Settlement Agreement ¶¶ 2, 4(a); *see also id.*, Ex. B.
[8] *Id.* ¶ 4(d).
[9] *Id.* ¶ 4(a), (b).
[10] *Id.* ¶ 4(i).

  f. Fox Run's Site Plan approval timeframe to apply for a building permit for Phase 1 of the project under section 11-7-409 of the Springville City Code will be extended from six-months to one year.[11]

Finally, the parties released prior claims and limited remedies for any breach of the Settlement Agreement.[12]

  Following settlement, Fox Run submitted its proposed site plan, and Springville prepared redlines.[13] Fox Run then submitted a revised plan that addressed some of the City's redlines but, according to Springville, it also made changes to the stipulated "Exhibit B" plan from the Settlement Agreement.[14] Springville sent an email to Fox Run notifying it of the discrepancies.[15] The parties met on October 8, 2018, and Fox Run agreed to revise the site plan according to Springville's concerns.[16] On October 18, Fox Run provided its revised site plan,[17] and on November 15, 2018, Springville approved Fox Run's site plan, which listed the Commencement Date as November 8, 2018.[18] In late October and early November 2019, Fox Run submitted to Springville materials for its application for a building permit.[19] Around that same time, Fox Run missed a mortgage payment on the property.[20]

  On November 25, Mr. John Penrod—the Springville City Attorney—notified Fox Run that it did not submit a complete building permit application within one year of the

---

[11] *Id.* ¶ 4(e), (f).

[12] *Id.* ¶¶ 10–11.

[13] Def.'s Mot. 14; Pl.'s Opp'n 5–6; *see also* Decl. of Laura Thompson ¶¶ 4–5, ECF No. 94-1.

[14] *See* Sept. 5 Email from Glen Goins, ECF No. 94-2; *see also* Def.'s Mot. 14–15; Pl.'s Opp'n 6.

[15] Sept. 5 Email from Glen Goins.

[16] Oct. 8 Email from Steven Kelly, ECF No. 94-3; *see also* Def.'s Mot. 15; Pl.'s Opp'n 6.

[17] Oct. 18 Email from Steven Kelly, ECF No. 94-5; *see also* Def.'s Mot. 15; Pl.'s Opp'n 6.

[18] Nov. 15 Letter from Glen Goins, ECF No. 8-2 Ex. 5; *see also* March 29 Email from Steven Kelly, ECF No. 94-6 (describing corrections to a typographical error on the original letter).

[19] *See* Am. Compl. ¶ 32; Answer to Am. Compl. ¶ 32, ECF no. 81.

[20] Pl.'s Responses to Springville's Requests for Admission, Response No. 3, ECF No. 94-14.

Commencement Date.[21] According to Mr. Penrod, Fox Run did not submit "any heating/cooling load calculations and duct design or structural engineering with endorsement [and] calculations."[22] In addition, Mr. Penrod claimed that the building elevations and interior plans shown in the application materials differed from the Exhibit B site plan.[23] Accordingly, Mr. Penrod notified Fox Run that its vested rights under the Settlement Agreement were terminated.[24] On December 6, 2023, Mr. Josh Yost—Springville's Community Development Director—issued a decision denying the building permit application on the basis that it was incomplete.[25] And again, on December 10, 2019, Mr. Yost informed Fox Run that an additional reason for denial of the application was because the building plans differed from those in Exhibit B.[26] On March 4, 2020, Fox Run's lender notified Fox Run of its intention to foreclose upon the property.[27] In July 2020, the property on which Fox Run had intended to build the senior living facility was sold in a foreclosure sale.[28]

Fox Run initially filed suit in April 2020.[29] On December 15, 2021, Fox Run filed its Amended Complaint, alleging: breach of contract, breach of the implied covenant of good faith and fair dealing, deprivation of procedural due process under state and federal law, deprivation of substantive due process under state and federal law, equal protection violation under state and federal law, and inverse condemnation under state and federal law.[30] In response to Springville's

---

21 *See* Nov. 25, 2019 Letter from John Penrod, ECF No. 94-10.
22 *Id.*
23 *Id.*
24 *Id.*
25 *See* Dec. 6, 2019 Letter from Josh Yost, ECF No. 94-11.
26 *See* Dec. 10, 2019 Letter from Josh Yost, ECF No. 94-12.
27 Notice of Default and Election to Sell, ECF No. 94-15.
28 *See* Def.'s Mot. 19–21; Pl.'s Opp'n 10.
29 *See* Compl., ECF No. 2.
30 *See* Am. Compl. ¶¶ 77–131.

motions to dismiss,[31] the court dismissed Fox Run's breach of contract and breach of the implied

covenant of good faith and fair dealing claims,[32] as well as Fox Run's state constitutional

claims.[33] Accordingly, all that remains are four federal constitutional claims. Now, Springville

seeks summary judgment on those claims.[34] Initial briefing on Springville's motion for summary

judgment was completed on January 2, 2024.[35] On April 29, 2024, the court ordered additional

briefing, which was completed on May 13, 2024.[36]

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[37] "A fact is material if, under the

governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material

fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence

presented."[38] Where the moving party does not bear the ultimate burden of proof on an issue at

trial, the party may simply point out to the court the lack of evidence to support the nonmoving

party's case.[39] The burden then shifts to the nonmoving party to demonstrate that there is a

genuine dispute of material fact for trial.[40]

---

[31] Def.'s Mot. to Dismiss Am. Compl., ECF No. 62; Def.'s Renewed Mot. to Dismiss Am. Compl., ECF No. 69.
[32] Order Granting in Part and Denying in Part [62] Springville's Mot. to Dismiss Am. Compl, ECF No. 68.
[33] Order Granting in Part and Denying in Part [69] Def.'s Mot. to Dismiss, ECF No. 80.
[34] See Def.'s Mot.
[35] See Pl.'s Opp'n; Springville's Reply Memorandum in Support of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 104.
[36] See ECF No. 113; Springville's Suppl. Brief in Support of its Mot. for Summ. J. ("Def.'s Suppl. Brief"), ECF No. 114; Pl.'s Suppl. Brief in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Suppl. Brief"), ECF No. 115.
[37] Fed. R. Civ. P. 56(a).
[38] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).
[39] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[40] *Id.* at 324.

**DISCUSSION**

Springville argues that all of Fox Run's claims were mooted by the foreclosure sale of the property at issue, and that each of Fox Run's claims fail as a matter of law.

## I.   Article III Mootness

Article III to the U.S. Constitution gives federal courts power to decide only cases and controversies.[41] Because this requirement is present throughout all stages of a case, there is the prospect that a once-live case will become moot.[42] A case becomes moot when "the parties lack a legally cognizable interest in the outcome" or, in other words, "when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision."[43] Springville argues that because Fox Run no longer has any interest in the property at issue and because paragraph 10 of the Settlement Agreement limits remedies to non-monetary relief, Fox Run lacks any remedy and its case is moot.[44] Fox Run argues that the Settlement Agreement did not limit remedies stemming from federal constitutional violations.[45] On reply, Springville argues that Fox Run essentially admitted that its case was moot by failing to adequately address the issue in its briefing.[46]

Springville's contention that the court should consider Fox Run to have conceded the issue is a non-starter. For starters, Fox Run did respond to Springville's argument, if only

---

[41] U.S. Const. art. III, § 2.
[42] *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016).
[43] *Id.* (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013); *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015)).
[44] Def.'s Mot. 45–47.
[45] Pl.'s Opp'n 26–27.
[46] Def.'s Reply 19–20.

briefly.[47] But regardless, Springville cites only to inapposite caselaw and local rules.[48] None of the authority Springville cites suggests that a nonmovant's failure to adequately respond to issues of law entitles the movant to judgment as a matter of law on that issue. Indeed, the Tenth Circuit has suggested that a failure to respond does not concede an issue, but instead merely waives objections that are not obvious to the court.[49]

Turning to the argument that the Settlement Agreement limits claims to non-monetary relief, the court observes that Springville made a very similar argument at the motion to dismiss stage,[50] which the court rejected. And again, paragraph 10 of the Settlement Agreement simply does not say what Springville suggests.

> 10. Remedies.
>
> a. If the parties are not able to resolve *a breach or default of any provision in this Agreement*, then the parties may have the following remedies:
>
> i. <u>Legal Remedies.</u> The rights and remedies available at law and in equity, including, but not limited to injunctive relief, specific performance and termination, but not including damages or attorney's fees.[51]

The plain meaning of paragraph 10 is that remedies for a breach of the Settlement Agreement are limited; it has nothing to say about remedies for constitutional claims. And Springville has made no reasoned argument to suggest that Fox Run's claims fall within the scope of paragraph 10.

---

[47] *See* Pl.'s Opp'n 26–27.
[48] *See* Def.'s Reply 19 (citing DUCivR 56-1(f); *Freight Tec Mgmt. Grp. Inc. v. Chemex, Inc.*, 2021 UT App 92, 499 P.3d 894; *United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320 (Fed. Cir. 2013)). The provision of the local rules is focused on whether a party filed any responsive briefing, not on whether a party's briefing was adequately responsive to an issue. *See* DUCivR 56-1(f). Next, the Utah Court of Appeals case is focused on issue preservation, not on the issue at hand. *See Freight Tec Mgmt. Grp. Inc.*, 2021 UT App 92, ¶¶ 35–38. And likewise, the Federal Circuit case cited again focuses on issue preservation. *See Great Am. Ins. Co. of N.Y.*, 738 F.3d at 1328.
[49] *See Cayetano-Castillo v. Lynch*, 630 Fed.Appx. 788, 794 (10th Cir. 2015).
[50] *See* Def.'s Renewed Mot. to Dismiss 17–18.
[51] Settlement Agreement ¶ 10 (emphasis added).

Springville cites to *BV Lending, LLC v. Jordanelle Special Service District* in support.[52] But that case is inapposite. There, the plaintiff challenged an assessment on property, but did not pay the assessment.[53] The property at issue was later foreclosed on.[54] Accordingly, the Utah Court of Appeals held that the claims challenging the assessment were moot, since the plaintiff never paid the assessment and no longer owed the assessment.[55] This is unlike the situation at hand. Fox Run has asserted claims for damages based on 42 U.S.C. § 1983, so the fact that it no longer owns the property at issue does not render its claims moot.

On reply, Springville emphasizes that "a party <u>can</u> contract away their constitutional rights."[56] But the question here is whether Fox Run did in fact contract away its constitutional rights. And the plain text of paragraph 10 is cabined to breaches of the Settlement Agreement itself. Indeed, in its own brief, Springville appears to acknowledge this: "In the Settlement Agreement, the parties also agreed to limit the legal remedies *for any breach or default of any provision of the Agreement*[.]"[57] Thus, Springville's suggestion that paragraph 10 applies to constitutional claims is without merit. Accordingly, the combination of the Settlement Agreement and foreclosure did not moot Fox Run's constitutional claims.

Additional analysis is required for Fox Run's inverse condemnation claim, however. The damages for a takings claim consist of "just compensation."[58] Typically, this means that the

---

[52] Def.'s Mot. 46.
[53] *BV Lending, LLC v. Jordanelle Special Serv. Dist.*, 2015 UT App 117, ¶¶ 2–6, 350 P.3d 636.
[54] *Id.* ¶ 11.
[55] *Id.* ¶ 18.
[56] Def.'s Reply 20.
[57] Def.'s Mot. 12 (emphasis added).
[58] *See* U.S. Const. amend V.

government must supply the fair market value of the property taken.[59] And in temporary regulatory takings cases, the Supreme Court has held that just compensation is to be calculated based on the period in which the taking occurred.[60] While the court is unaware of any apposite caselaw on the issue of whether foreclosure after an alleged regulatory taking moots the plaintiff's inverse condemnation claim, the court finds temporary takings jurisprudence to be dispositive. In other words, here, while it would be relevant to the ultimate question of damages that Fox Run's property was later sold in a foreclosure sale, it would not moot the inverse condemnation claim in its entirety; assuming a regulatory taking occurred, Springville would owe just compensation for the period between the denial of the building permit application and the foreclosure sale.

Accordingly, the sale of the property at issue did not moot Fox Run's claims for damages under 42 U.S.C. § 1983 and the Takings Clause.[61]

## II.   Due Process

Property is protected by the due process clause of the Fourteenth Amendment.[62] The Tenth Circuit has observed that "[p]rocedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of

---

[59] *See United States v. Miller*, 317 U.S. 369, 373–74 (1943); *United States. v. 564.54 Acres of Land, More or Less, Situated in Monroe and Pike Cntys.*, 441 U.S. 506, 512–13 (1979) (describing the circumstances in which fair market value may or may not be appropriate).
[60] *See First Eng. Evangelical Lutheran Church of Glendale v. L.A. Cnty.*, 482 U.S. 304, 319 (1987) ("Where [a burden on property] from governmental action [amounts] to a taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period.").
[61] *See* Am. Compl. ¶¶ 107–131.
[62] *See* U.S. Const. amend. XIV, § 1.

the procedures used to reach that decision."[63] The court considers: (A) whether Fox Run was deprived of a property interest; and (B) if so, whether such deprivation lacked fair procedures or was for an arbitrary reason.[64]

### A.   Deprivation of a Property Interest

Property interests are not created by the Constitution, but instead, are created by independent sources of law, such as state law or municipal law.[65] "Property," for purposes of the Due Process Clause, includes a benefit to which an individual has a legitimate claim of entitlement.[66] However, "[a]n abstract need for, or unilateral expectation of, a benefit does not constitute 'property.'"[67] For instance, a benefit that rises to the level of property protected by the Due Process Clause may be created by contract or by statute.[68] "In municipal land use regulation cases such as this, the entitlement analysis presents a question of law and focuses on 'whether there is discretion in the defendants to deny a zoning or other application filed by the plaintiffs.'"[69]

Springville argues that Fox Run did not have a property interest in its building permit application because it did not satisfy the terms of the Settlement Agreement, including by submitting an inconsistent site plan and by submitting an incomplete application.[70] Fox Run counters that its property right to develop was not created by the Settlement Agreement.[71] The

---

[63] *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).
[64] *See Jordan-Arapahoe*, 633 F.3d at 1025; *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1172 (10th Cir. 2016).
[65] *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *accord Van Sant & Co v. Town of Calhan*, 83 F.4th 1254, 1277 (10th Cir. 2023).
[66] *Roth*, 408 U.S. at 577; *accord Van Sant & Co.*, 83 F.4th at 1277.
[67] *Van Sant & Co.*, 83 F.4th at 1277 (quoting *Hyde Park*, 226 F.3d at 1210); *accord Roth*, 408 U.S. at 577.
[68] *See Roth*, 408 U.S. at 578.
[69] *Van Sant & Co.*, 83 F.4th at 1277 (quoting *Hyde Park*, 226 F.3d at 1210).
[70] Def.'s Mot. 23–26.
[71] Pl.'s Opp'n 16–18.

court begins by addressing what source of law created Fox Run's purported property interest in its permit application.

### 1.    Source of Fox Run's Purported Property Interest

The only evidence Fox Run points to in support of its assertion that its property right to develop was not created by the Settlement Agreement is a statement from "the City's own employee."[72] Fox Run, however, fails to cite to any evidence that might suggest which city employee made such a statement, if at all. And regardless, as noted above, this issue is a question of law, so a city employee's opinion on whether Fox Run had a property right is immaterial. In addition, Fox Run points out that the Settlement Agreement contains a provision under which "the parties agree that for purposes of this Agreement Fox Run has received vesting to construct the Project as shown [in the Development Plans]."[73] This provision, however, is unequivocally limited to the Agreement itself; it does not suggest that Fox Run in fact had a property interest predating the Settlement Agreement.

Utah law establishes that, generally, "an applicant is entitled to a building permit or subdivision approval if his proposed development meets the zoning requirements in existence at the time of his application and if he proceeds with reasonable diligence, absent a compelling, countervailing public interest."[74] However, at a bare minimum, an applicant must submit a "complete application" that "conforms to the requirements of the applicable land use regulations, land use decisions, and development standards in effect when the applicant submits a complete

---

[72] *See id.* 16.
[73] Settlement Agreement ¶ 4(a).
[74] *W. Land Equities, Inc. v. City of Logan*, 617 P.2d 388, 396 (Utah 1980); *see also* Utah Code § 10-9a-509(1)(a)(ii) (2020).

application[.]"[75] Thus, the inquiry, per the Utah Code, is whether Fox Run submitted an application that conformed to municipal law prior to entry into the Settlement Agreement: if it did not, then the question is whether the Settlement Agreement itself created a property right; however, if Fox Run did submit an application prior to entry into the Settlement Agreement, then the question is whether the Settlement Agreement altered that right.

Mr. Kelly, Fox Run's registered agent, declares that on May 11, 2016, Springville informed Fox Run that it could proceed with a site plan application,[76] and on October 26, 2016, Fox Run submitted a site plan application for all seven phases of the Project.[77] Springville suggests that these declarations are immaterial because of the release provision in the Settlement Agreement.[78] In addition, the court observes that the Settlement Agreement recites that "[t]he parties agree that no building permit application has been submitted for any building within any phase."[79]

Assuming that there is at least a genuine dispute of material fact whether Fox Run had submitted an application that conformed to Springville's land use regulations prior to entry into the Settlement Agreement, the court concludes that the Settlement Agreement altered any property right possessed by Fox Run. The Settlement Agreement released "all claims, demands, liabilities, damages, [and] causes of action . . . arising out of or in any way related to the Dispute, Project and subject matter of this Agreement."[80] It also contained a number of requirements for

---

[75] Utah Code § 10-9a-509(1)(a) (2020). "A land use application is considered submitted and complete when the applicant provides the application in a form that complies with the requirements of applicable ordinances and pays all applicable fees." *Id.* § 10-9a-509(1)(c) (2020).
[76] Decl. of Steven Kelly in Support of Opp'n to Def.'s Mot. for Summ. J. ("Kelly Decl.") ¶ 4, ECF No. 103-6.
[77] *Id.* ¶ 6.
[78] *See* Springville's Statement of Undisputed Facts 18, ECF No. 104-1.
[79] Settlement Agreement ¶ 4(d).
[80] *Id.* ¶ 11.

any future permit application.[81] Specifically, the Agreement provides that if Fox Run fails to begin construction or apply for a building permit within one year, "all vested rights granted under this Agreement shall automatically terminate."[82] The upshot of all this is that Fox Run could not have brought a procedural or substantive due process claim based on any activity occurring prior to the Settlement Agreement, and its only avenue to proceed with development under the old Springville City Code was through the process specified by the Agreement; accordingly, the Settlement Agreement must have at least modified Fox Run's property right. In other words, any property right Fox Run could have obtained would be established both by the Settlement Agreement and by relevant state statutes and local ordinances.

### 2.    The Terms of the Settlement Agreement and Utah Code

Springville argues that Fox Run submitted an incomplete building permit application and that "the site plan Fox Run submitted with its building permit application materials was materially inconsistent with the Exhibit B site plan."[83]

### i.    Inconsistent Site Plan

The Springville City Code requires the submission of a proposed site plan for any new development.[84] It then requires that "[a] building permit for an approved site plan" be applied for within six months of the date of approval with the prospect of another six-month extension.[85] The Settlement Agreement itself provides that Fox Run was to have one year to submit a

---

[81] *See id.* ¶ 4(b)–(j).
[82] *Id.* ¶ 4(g).
[83] Def.'s Mot. 23, 24; *see also id.* 13–18.
[84] Springville City Code §§ 11-7-402, -404,
https://www.codepublishing.com/UT/Springville/#!/Springville11/Springville117.html#11-7-101
[https://perma.cc/DQ59-BJNA].
[85] *Id.* § 11-7-409.

building permit application following site plan approval.[86] In addition, the Settlement Agreement

requires that building exterior elevations and interior plans be identical to the plans shown in

Exhibit B.[87] Springville suggests that the site plan submitted with the application was

inconsistent with the Exhibit B site plan because "it contained changes to the building elevations

and interior plans[.]"[88] Fox Run argues that "[t]he elevations and floor plans were exactly the

same as those in the plans approved by" Springville, and that the only changes in the site plans

attached to the permit application were those consistent with Springville's redlines.[89]

The only evidence Springville points to in support of its argument are email

communications cited in the Complaint and Answer.[90] Paragraph 40 of the Complaint references

a December 10, 2019 email from Mr. Yost, which stated that "the submitted design differs from

the design attached to the Agreement."[91] And paragraph 84 of the Complaint references the same

email, along with a November 25, 2019 email from Mr. Penrod, which also stated that "[t]he

elevation and interior plans submitted by Fox Run are substantially different than the required

plans, including, but not limited to, a different height, architectural features, and building

materials."[92] But Springville does not provide the court with record citations for the differences

between the plan submitted along with Fox Run's application and Exhibit B. Therefore, the court

---

[86] Settlement Agreement ¶¶ 4(e), (f).

[87] *See id.* ¶ 4(i) ("Unless the parties mutually agree to a different building design, Fox Run agrees that the building exterior elevations and interior plans shown on [Exhibit B] will be the building elevations and interior plans for the buildings constructed within the Project[.]").

[88] Def.'s Mot. 24.

[89] Pl.'s Opp'n 16–17.

[90] *See* Def.'s Mot. 16 ("The proposed site plan that Fox Run uploaded contained still *more* changes from the stipulated Exhibit B plan. Specifically, in the uploaded site plan, the building elevations and interior plans differ from those attached to Exhibit B in architectural design, building height, materials, and floor plans. (citing Am. Compl. ¶¶ 40, 84; Answer to Am. Compl. ¶¶ 40, 84)).

[91] *See* Am. Compl. ¶ 40; Dec. 10, 2019 Letter, ECF No. 94-12.

[92] *See* Am. Compl. ¶ 84; Nov. 25, 2019 Letter from John Penrod; *see also* Dep. of John Penrod ("Penrod Dep.") 83:7–86:17, ECF No. 94-8.

is unable to compare either plan to the other to determine whether there is a genuine dispute of material fact on the issue of whether Fox Run submitted a materially changed site plan with its permit application. And in opposition, Fox Run provides a declaration from its manager, Mr. Kelly, that "[t]he building permit application submitted by Fox Run contained the exact documents approved by the City pursuant to issuance of the Commencement Letter."[93] Likewise, Fox Run submits a declaration from Mr. Tuttle, its architect, who declares that "[t]he general character, materials, building height, etc. were the same" between the two site plans.[94]

The court concludes that, given the competing declarations and because Springville has failed to identify any differences in the plans themselves, there is a genuine dispute of material fact on this issue.

### ii.      Incomplete Application

For purposes of creation of a property right, the Utah Code defines a "complete land use application" as an application "that complies with the requirements of applicable ordinances[.]"[95] While the Settlement Agreement recognized Fox Run's vested property right in the Project,[96] that right was not absolute. Instead, Fox Run's right was contingent on submitting a complete application; if Fox Run failed to do so, then its right would be terminated.[97] Accordingly, the court turns to a review of the Springville's ordinances establishing the requirements for a building permit application.

---

[93] Kelly Decl. ¶ 27.
[94] Suppl. Decl. of Eric R. Tuttle ¶ 9, ECF No. 103.
[95] Utah Code § 10-9a-509(c) (2020).
[96] *See* Settlement Agreement ¶ 4(a).
[97] *See* Settlement Agreement ¶ 4(d) ("[E]ach building permit application shall go through [Springville's] building permit process[.]"); *id.* ¶ 4(g) (providing that Fox Run's vested rights would be terminated if it did not apply for a building permit within one year of the Commencement Date).

Springville points to a checklist that it provided applicants, which states that applicants should submit "[e]ngineering (if required) with endorsement and calculations" and "heating/cooling load calculations and duct design," among other items.[98] But that checklist is not itself a source of law; so while it is a helpful visual for applicants, it does not itself establish what was and what was not required to be submitted. Instead, the court looks to the Springville City Code. The Springville City Code states that "[n]o permit shall be issued for any work regulated or controlled in any way by the provisions of this Title unless the application is accompanied by all plats, plans, drawings, specifications, and other information required by the various codes adopted hereby."[99] And indeed, the Springville City Code incorporates by reference several other codes,[100] including the International Building Code and the International Mechanical Code.[101] Nothing in the Settlement Agreement altered these general requirements.[102]

Springville asserts that Fox Run did not submit "any heating/cooling load calculations and duct design or structural engineering with endorsement [and] calculations."[103] In subsequent briefing, Springville clarified its position was that "Fox Run did not provide a signed truss

---

[98] Commercial Building Permit Checklist, ECF No.103-4.

[99] Springville City Code § 10-4-103, https://www.codepublishing.com/UT/Springville/#!/Springville10/Springville104.html#10-4-102 [https://perma.cc/M4V7-G3UG].

[100] Springville City Code § 10-7-101, https://www.codepublishing.com/UT/Springville/#!/Springville10/Springville107.html [https://perma.cc/9GDD-WVWE] ("New editions of the various State of Utah, national, and international building and construction standards and codes as specified in sections 10-1-101, 10-1-106, 10-2-1-1, 10-2A-101, 10-2A-201, 10-3-101 of the Springville City Code . . . shall be automatically adopted unless otherwise specified or amended therein.").

[101] Springville City Code § 10-1-101, https://www.codepublishing.com/UT/Springville/#!/Springville10/Springville101.html#10-1 [https://perma.cc/6M94-XTVF] (incorporating by reference the International Building Code); *id.* § 10-1-106 (incorporating by reference the International Mechanical Code).

[102] *See* Settlement Agreement ¶ 4(j) ("Fox Run shall follow all of state, federal and City building codes, land use regulations, rules, laws, statutes, ordinances, and regulations that are not in opposition with this Agreement.").

[103] Def.'s Mot. 16.

engineering drawing or heating and cooling load calculations."[104] Fox Run admits that its submission "did not contain 'stamped truss details' and did not contain all calculations necessary to justify the HVAC ductwork design,"[105] but takes the position that these elements were not required.[106]

First, with respect to Springville's argument that Fox Run's application was incomplete because it lacked a signed truss engineering drawing, the Springville City Code requires that for buildings of two stories or more, or containing more than four single-family dwelling units, the applicant furnish plans and specifications that are certified by an architect licensed by the State of Utah.[107] For starters, it is not clear that the requirement that plans in general be certified by an architect requires that truss engineering drawings themselves be signed. Springville primarily points to deposition transcripts of its employees, and a declaration from one of Fox Run's experts to support its apparent argument that the truss engineering drawing was not signed by an architect.[108] The deposition testimony merely contains discussion of Springville employees' prior communications to Fox Run indicating that Fox Run's application was missing either "structural engineering calculations"[109] or "structural engineering with endorsement

---

[104] Def.'s Suppl. Brief 4.

[105] Pl.'s Opp'n 7.

[106] *See id.* ("Fox Run's submission did include all necessary structural engineering calculations and information."); Pl.'s Suppl. Brief 3–4 ("Nowhere does either [the Springville City Code] or [the International Building Code] expressly require truss engineering drawings or heating and cooling load calculations be separately and specifically provided.").

[107] Springville City Code § 10-1-103, https://www.codepublishing.com/UT/Springville/#!/Springville10/Springville101.html#10-1 [https://perma.cc/6M94-XTVF].

[108] *See* Def.'s Mot. 16–17.

[109] Dep. of Josh Yost 49:8–49:13, ECF No. 94-7; *see also* Dec. 6, 2019 Letter from Josh Yost (noting that Fox Run failed to submit at least the "[h]eating and cooling load calculations and duct design" as well as "[s]tructural engineering calculations with endorsement from a design professional").

calculations."[110] At the summary judgment stage, neither the deposition testimony nor the letters to Fox Run are sufficient to show that Fox Run in fact lacked a complete application. A jury could credit the letters, or not. And Fox Run's expert declared that "[t]he truss manufacturer had not stamped the truss details[.]"[111] This statement does not suggest that an architect had not signed off on the building plans, as the Springville City Code requires. A jury could find that the statement is synonymous with the requirement stated in the Code, or it could not. And even if it is true that the truss manufacturer had not "stamped the truss details," Springville has not shown that it is entitled to judgment as a matter of law because of that deficiency.

Second, turning to Springville's argument that Fox Run's application was deficient because it did not include heating and cooling load calculations, Springville asserts that this requirement can be found in the International Building Code and the International Mechanical Code.[112] While the International Mechanical Code requires that "construction documents, engineering calculations, diagrams and other data" be submitted with a building permit application,[113] the International Building Code contains no similar requirement.[114] And Springville makes no argument to suggest why the provisions it cites include heating and cooling load calculations; it simply makes the conclusory assertion that they do, based on the term

---

[110] Penrod Dep. 80:7–82:2; *see also* Nov. 25, 2019 Letter from John Penrod.

[111] Decl. of Edmund C. Domian ¶ 7, ECF No. 8-14.

[112] Def.'s Suppl. Brief 3–4.

[113] *See* International Code Council, International Mechanical Code § 106.3.1 (2018), https://codes.iccsafe.org/content/IMC2018/chapter-1-scope-and-administration [https://perma.cc/FEW4-XV3A].

[114] Springville quotes Section 106.1 of the 2006 edition as stating "Construction documents, engineering calculations, diagrams, and other data shall be submitted . . . with each permit application." Def.'s Suppl. Brief 4 n.3. But that section is misquoted. No section in Chapter 1 of the International Building Code refers to "engineering calculations." *Cf.* International Code Council, International Building Code (2006), https://codes.iccsafe.org/content/IBC2006/chapter-1-administration [https://perma.cc/22DG-3U8B]; International Code Council, International Building Code (2018), https://codes.iccsafe.org/content/IBC2018/chapter-1-scope-and-administration [https://perma.cc/MS6K-HQ93].

"engineering calculations."[115] While it certainly may be the case that the term "engineering calculations" could include HVAC load calculations, it is not clear from the International Mechanical Code that the former includes the latter. Without any evidence or legal analysis to suggest why "engineering calculations" includes HVAC load calculations, Springville's argument falls short.

That being said, the court observes that at numerous points throughout its briefing, Fox Run itself states that its application was about 98% complete.[116] Under the party presentation principle,[117] the court will take Fox Run at its word. Accordingly, the court finds that there is no genuine dispute of material fact that Fox Run submitted an incomplete application. And under the Utah Code, unless a party has submitted a complete application, it does not have a property interest in development. Therefore, judgment as a matter of law is appropriate on this issue.

### B.   Adequacy of Procedure and Reasons for Deprivation

#### 1.   Procedural Due Process

As discussed above, procedural due process ensures that the government's decision to deprive an individual of property was reached through fair procedures.[118] "The essence of procedural due process is the provision to the affected party of '*some* kind of notice and . . . *some* kind of hearing.'"[119] And the opportunity to be heard must occur "at a meaningful time and in a meaningful manner."[120]

---

[115] *See* Def.'s Suppl. Brief 3–4 (quoting the International Mechanical Code and emphasizing "engineering calculations").

[116] *See* Pl.'s Opp'n 7, 19, 23; Pl.'s Suppl. Brief 4.

[117] *See, e.g., Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008).

[118] *Hyde Park Co.*, 226 F.3d at 1210.

[119] *Moore v. Bd. of Cnty. Comm'rs*, 507 F.3d 1257, 1259 (10th Cir. 2007) (internal quotations omitted) (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)); *accord Onyx Props. LLC v. Bd. of Cnty. Comm'rs*, 838 F.3d 1039, 1045 (10th Cir. 2016).

[120] *Matthews v. Edlridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

The Amended Complaint takes issue with the procedures used to decide the application, including Fox Run's inability to supplement or cure the application,[121] as well as the inadequacy of post-deprivation procedures.[122] Fox Run does not clearly set forth in its Amended Complaint what kind of notice or opportunity to be heard was lacking. Indeed, in its Amended Complaint and briefing, Fox Run suggests that its procedural due process claim is based on alleged arbitrary decision making or unequal treatment.[123] However, in its briefing, Fox Run specifically takes issue only with its inability to supplement or cure its application after submission.[124]

Assuming that it is true that Fox Run was not allowed to supplement its application, Fox Run's procedural due process claim could not succeed on that basis. The ability to cure or supplement the application is only an issue if the application itself was incomplete or inconsistent with the Exhibit B site plan. And if the application was incomplete or inconsistent with the Exhibit B site plan, then per the Utah Code and the Settlement Agreement,[125] Fox Run would not have a property right in its application, thereby negating any procedural due process claim at the outset.

Accordingly, Springville is entitled to judgment as a matter of law on Fox Run's procedural due process claim based upon the alleged inability to supplement or cure its application. As that is the only issue Fox Run has argued regarding Springville's procedure, the

---

[121] Am. Compl. ¶¶ 43, 47, 54, 82, 111–15.

[122] *See* Am. Compl. ¶¶ 112–15.

[123] *See* Pl.'s Opp'n 20–21 (referring to other similarly situated applicants multiple times); Am. Compl. ¶ 111 ("The City's actions in this regard were arbitrary, capricious, and discriminatory.").

[124] *See* Pl.'s Opp'n 20–21 ("Fox Run is not required to demonstrate that post-deprivation remedies were inadequate, or even that Fox Run was denied an appeal after [Springville] made a clearly final decision. The procedure that was inadequate and failed to provide due process was [Springville's] review process of the [application] and subsequent rejection without allowing supplementation.").

[125] *See* Utah Code § 10-9a-509 (2020); Settlement Agreement ¶ 4(i).

court need not reach the remaining issues in the parties' briefs. Any issues with arbitrary decision making or the denial of equal treatment sound in substantive due process and equal protection respectively.

### 2.    Substantive Due Process

As discussed above, substantive due process in this context ensures that the government "will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision."[126] "When analyzing executive action, 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'"[127] "Intentionally or recklessly causing injury through the abuse or misuse of government power is not enough. The actions 'must demonstrate a degree of outrageousness and magnitude of potential or actual harm that is truly conscience shocking.'"[128] "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."[129]

Springville argues that Fox Run lacks evidence of any arbitrary decision making on the part of the City.[130] Fox Run suggests that Springville's rejection of its application was arbitrary and capricious because it was not permitted to supplement or cure its application.[131] As above, however, if Fox Run could have supplemented or cured its application, it would not have had a property right to begin with. But in any event, Fox Run does not explain how such rejection was

---

[126] *Hyde Park Co.*, 226 F.3d at 1210.
[127] *Onyx Props. LLC*, 838 F.3d at 1048–49 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).
[128] *Id.* at 1049 (quoting *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 513 (10th Cir. 2011)); *accord Cnty. of Sacramento*, 523 U.S. at 846 ("[T]he cognizable level of executive abuse of power [is] that which shocks the conscience.").
[129] *Cnty. of Sacramento*, 523 U.S. at 849.
[130] Def.'s Mot. 29, 32.
[131] Pl.'s Opp'n 23.

arbitrary in the constitutional sense. It does not suggest that Springville or any of its officials acted with the requisite degree of culpability required for a substantive due process claim, and it does not point to any evidence that would suggest any such culpability. To the contrary, Fox Run expressly notes that it makes no claim that Springville "engaged in misconduct."[132] The court agrees: the record evidence could not support a finding of the "most egregious" conduct rising to the required "conscience-shocking level."

Accordingly, Springville is entitled to judgment as a matter of law on Fox Run's substantive due process claim. The only theory Fox Run raises would not suffice to establish a substantive due process claim. And in any event, Fox Run has not carried its burden in rebutting Springville's motion by pointing to any facts that would suggest that there was a genuine dispute that Springville acted arbitrarily and capriciously. The court need not address the remaining issues identified by the parties' briefing.

### III.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall not "deny to any person within its jurisdiction the equal protection of the laws."[133] Generally, this means that the government should treat "all persons similarly situated" alike.[134] And "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference[.]"[135] The level of scrutiny applied depends on whether the "challenged government action implicates a fundamental right,

---

[132] Pl.'s Opp'n 22.
[133] U.S. Const. amend. XIV, § 1.
[134] *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir. 2014) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).
[135] *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 602 (2008).

or classifies individuals using a suspect [or quasi-suspect] classification[.]"[136] The Supreme Court has held that in certain circumstances, class of one claims are viable.[137] They are not viable, however, when the challenged government action involves a high degree of discretionary decisionmaking.[138] A class of one claim requires that the plaintiff prove (A) that the defendant has intentionally treated it differently from those similarly situated and (B) that there is no rational basis for the different treatment.[139] Springville argues that Fox Run lacks evidence sufficient to create a genuine dispute as to both prongs.[140]

### A.   Differential Treatment

The Tenth Circuit has imposed "a substantial burden" on plaintiffs asserting a class of one claim, in that they must "demonstrate others similarly situated in all material respects were treated differently[.]"[141] "It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class."[142] This high bar arises from the concern that class of one claims would "create a flood of claims in that area of government action where discretion is high and variation is common."[143]

---

[136] *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008).

[137] *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000) (per curiam). *But see Engquist*, 553 U.S. at 604–05 (holding a class of one theory does not apply in the public employment context). The court observes that Fox Run states that it was not a class of one, but instead was simply a similarly situated applicant. *See* Pl.'s Opp'n at 24. But the gravamen of Fox Run's equal protection claim is that Springville imposed different standards or requirements on Fox Run than it did for other applicants, and that it did so based on animus towards Fox Run. *See* Am. Compl. ¶ 127. That is a class of one claim, since it does not allege that Plaintiff was a member of a protected class or group that the government was treating differently as a whole. *See, e.g.*, *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1253 (10th Cir. 2016).

[138] *Engquist*, 553 U.S. at 603–04.

[139] *Planned Parenthood Ass'n of Utah*, 828 F.3d at 1253 (quoting *Olech*, 528 U.S. at 564).

[140] Def.'s Mot. 36–40.

[141] *Planned Parenthood*, 828 F.3d at 1257 (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1217 (10th Cir. 2011)).

[142] *Id.* (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004)).

[143] *Kan. Penn. Gaming*, 656 F.3d at 1218.

Springville argues that Fox Run's response to its contention interrogatory establishes that its claim is based solely on approval of 17 other applications, and that it cannot satisfy its burden because it cannot show that other applicants were similarly situated in all relevant respects.[144] Namely, it notes that no other applicant was subject to a settlement agreement that required building plans submitted with the application to be identical to those approved earlier, no other applicant has been allowed to exceed height requirements, and that no other applicant failed to include all necessary items by the application deadline.[145] Fox Run argues that the Settlement Agreement did not materially alter the contents of its application, that it submitted materially identical site plans, and that each other applicant was also missing portions of its application, but was allowed to supplement it.[146] Indeed, Fox Run points to some record evidence that some other applicants were allowed to supplement their applications and that Springville's 30(b)(6) representative was unaware of another applicant who was denied the ability to supplement their application.[147]

The court concludes that Fox Run has failed to carry its burden in pointing to evidence that creates a genuine dispute of material fact that the other applications were similarly situated in all relevant respects. As discussed above, there is at least a genuine dispute of material fact whether Fox Run submitted a site plan identical to Exhibit B with its application.[148] But Fox Run has failed to show that other applicants were permitted to supplement their applications following the application deadline. The Springville City Code requires that "[a] building permit

---

[144] Def.'s Mot. 36–40.
[145] *Id.* 39–40.
[146] Pl.'s Opp'n 24–25.
[147] *Id.* at 15; *see also* Building Permit Applications, ECF No. 103-2; Penrod Dep. 72:23–73:7. Springville objects that Fox Run points to new evidence after the close of discovery. *See* Def.'s Reply 16–17.
[148] *See supra* Section II.A.2.i.

24

for an approved site plan . . . be applied for within six months from the date of approval . . . . One extension of up to six months may be requested in writing[.]"[149] And while Fox Run asserts that the other applicants were each "allowed to supplement [their] building permit application with additional or missing information after the deadline,"[150] Fox Run merely provides a generalized citation to a 100-page document containing multiple different building permit applications. Without particular citation or discussion from Fox Run, the court cannot say that Fox Run has carried its burden in demonstrating that there is a genuine dispute of material fact on this issue.[151]

But even if other applicants had been allowed to supplement their applications following the relevant deadlines, there is still the matter of the Settlement Agreement. Fox Run and Springville were parties to a Settlement Agreement that defined Fox Run's right to proceed with a building permit application under a since-revised version of the Springville City Code. As discussed above, because Fox Run failed to submit a complete application within the deadlines set, it failed to acquire a property right to a permit under the old definition of "Senior Independent Living Facility." Fox Run has not pointed to any evidence to suggest that any other applicant who was allowed to supplement their application after the relevant deadline was subject to a similar agreement. Likewise, Fox Run has not pointed to any evidence to suggest

---

[149] Springville City Code § 11-7-409, https://www.codepublishing.com/UT/Springville/#!/Springville11/Springville117.html#11-7-101 [https://perma.cc/DQ59-BJNA].

[150] Pl.'s Opp'n 15.

[151] *See* Fed. R. Civ. P. 56(c) ("(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to *particular* parts of materials in the record . . . . (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record." (emphasis added)); DUCivR 56-1(c)(4) ("If additional material facts are relevant to show that there is a genuine dispute of material fact, the party must state each additional fact and cite *with particularity* to the Appendix that contains the supporting evidence." (emphasis added)). The court's own review does not suggest that any of these applications were supplemented following the relevant deadlines. *Cf.* Building Permit Applications.

that any other applicant who was allowed to supplement their application did so after a material revision to a relevant portion of the Springville City Code.

Accordingly, Fox Run has failed to carry its burden in pointing to evidence that creates a genuine dispute of material fact for trial. Without such evidence, Fox Run cannot show that it was subjected to differential treatment, and Springville is entitled to judgment as a matter of law on this issue.

### B.    Rational Basis

A class of one plaintiff also must show that any "difference in treatment was without rational basis, that is, the government action was 'irrational and abusive,' and 'wholly unrelated to any legitimate state activity.'"[152] "This standard is objective—if there is a reasonable justification for the challenged action, [courts] do not inquire into the government actor's actual motivations."[153]

Springville argues that Fox Run cannot establish that Springville lacked a rational basis for any differential treatment because it cannot establish that failure to provide a complete application by the deadline and differences between site plans were objectively unreasonable bases for denial.[154] Fox Run does not make any response to this argument.[155] The court finds that there is at least one rational basis for any differential treatment on the part of Springville. The Settlement Agreement created the timeframe for Fox Run to submit a complete building permit application; if no complete application were submitted within that timeframe, then Fox Run's

---

[152] *Kan. Penn Gaming*, 656 F.3d at 1216 (quoting *Jicarilla Apache Nation*, 440 F.3d at 1210; *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005)).
[153] *Id.*
[154] Def.'s Mot. 39–40.
[155] *Cf.* Pl.'s Opp'n 24–25.

right to a permit utilizing the old definition of "Senior Independent Living Facility" would be terminated.[156] Any refusal on the part of Springville to allow Fox Run to supplement its incomplete application was rationally related to its interest in enforcing the revised version of the Springville City Code and enforcing its contractual rights. At the very least, absent any argument from Fox Run[157]—as the party with the burden of proof[158]—to suggest how Springville's challenged actions were irrational, the court must grant Springville summary judgment.

Accordingly, Springville is entitled to judgment as a matter of law on Fox Run's equal protection claim, since Fox Run has failed to point to evidence creating a genuine dispute of material fact that it was treated differently than any other similarly situated applicants, or that any such differential treatment lacked a rational basis.

## IV.   Takings

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.' The Clause is made applicable to the States through the Fourteenth Amendment."[159] There are two types of takings: physical takings and regulatory takings.[160] Fox Run does not suggest that a physical taking has occurred.[161]

---

[156] *See* Settlement Agreement ¶¶ 4(e), (f).

[157] *See, e.g.*, *Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) ("A party forfeits an issue it does not support with 'legal authority or argument.'" (quoting *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1244 (10th Cir. 2003))).

[158] *See Grigsby v. Barnhart*, 294 F.3d 1215, 1220 (10th Cir. 2002); *Planned Parenthood Ass'n of Utah*, 828 F.3d at 1257.

[159] *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897)).

[160] *See id.* at 392–93.

[161] *Cf.* Pl.'s Opp'n 25–26; Am. Compl. ¶¶ 129–31. And in any event, any such theory would likely fail. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332 (2002) (holding that a temporary restriction on development that causes a diminution does not affect a per se taking because it does not deprive the owner of all economically valuable use of the property, given that the property will recover its value once the prohibition is lifted).

Springville argues that Fox Run had no cognizable property interest and that, either way, there was no taking.[162] Fox Run resists both arguments.[163] The court need only address the first.

The analysis for determining the existence of a property interest for purposes of the Takings Clause mirrors the analysis under the Due Process Clause.[164] While the parties' briefing shows some confusion over the nature of Fox Run's claim, in its Opposition, Fox Run clarified that "[t]he property interest that was taken was Fox Run's vested rights in the project and inherent interest in receiving the building permit, to which it had a well-settled right to receive."[165] Given that this is the same alleged property right that was at issue in Fox Run's procedural and substantive due process claims, as discussed above, because Fox Run admits that it did not submit a complete building permit application, it could not have a property interest in development that was taken through a denial of said application.[166] Accordingly, the court finds that there is no genuine dispute of material fact on this issue and that Springville is entitled to judgment as a matter of law.

---

[162] Def.'s Mot. 40–45.
[163] Pl.'s Opp'n 25–26.
[164] *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Roth*, 408 U.S. at 577).
[165] Pl.'s Opp'n 25.
[166] *See supra* Section II.A.

**ORDER**

For the forgoing reasons, the court GRANTS Springville's motion.[167] There are no genuine disputes of material fact, and Springville is entitled to judgment as a matter of law on each of Fox Run's remaining claims.

Signed July 17, 2024.

BY THE COURT

_____

David Barlow
United States District Judge

---

[167] ECF No. 94.